## McMASTER, Respondent v. MONTANA UNION RAILWAY COMPANY, Appellant.

[Submitted March 8, 1892. Decided March 28, 1892.]

Damages — *Negligence — Railroad companies — Injuries to stock.* — In an action for damages against a railroad company for the killing of stock, the complaint alleged the negligent and careless running of an engine and cars against them by the defendant's agents. The killing was admitted, negligence denied, and contributory negligence pleaded by defendant. It appeared in evidence that defendant, though not required by law, had built and maintained a fence along its right of way, with gates at the siding, where the accident occurred, for the accommodation of its patrons. Plaintiff offered evidence in rebuttal showing that the gates at the place of accident were broken down so as to admit stock upon the track, and that his stock, which had been turned out upon the public domain, had strayed through them on to defendant's track and right of way. The evidence concerning the fence and gates was introduced by each party without objections from either. The jury found specially that defendant was negligent, among other things, in not keeping said gates closed and locked. *Held,* that defendant's objection that no foundation was laid in the pleadings for the introduction of such evidence, would not be sustained on appeal, because such evidence may have been justified under the issue of contributory negligence; and also because the subject of said fence, and the introduction of evidence thereon, was brought into the case by appellant as a matter for the jury to consider, and all such evidence was introduced thereon without objection or exception by either party. (De Witt, J., dissenting, and for his view of statement of case see his opinion.)

Same — *Same — Evidence.* — In the case at bar defendant's engineer testified that his engine struck two of plaintiff's horses on a slight curve in the road; that the

night was dark, foggy, rainy and misty; that he was on the right side of the cab; that the engine struck only two horses, and both at the same instant; that he saw the horses about sixty feet, or two car lengths ahead, but could have seen six or seven car lengths ahead had the weather been clear; that he did not have any time to stop the train, or sound the whistle; that the headlight was good and air brakes fully equipped. The fireman testified that only two horses were struck, and both were struck at the same instant; that they were about two car lengths ahead when first seen; that the engineer made no effort to stop the train because he did not have time, he went over them so quick; that the night was dark, and there was a fog of ordinary density; that there was a curve in the track at the place of accident; that there was not time to ring the bell until after the horses were hit; that the speed of the train was about thirty-five miles an hour; that in going around the curve the track could have been seen about one hundred and eighty feet ahead had the night been clear. Other evidence was introduced by defendant to the effect that the weather was stormy, rainy, and misty. Testimony was offered by plaintiff to the effect that the curvature of the track at the place of the accident was slight, and, notwithstanding the same, the track was in plain and unobstructed view from either direction, and that fact was not disputed; that early in the morning following there was no visible signs of mist having fallen, or dampness on the ground or vegetation at the place of the accident, as observed by those threshing grain in adjoining fields. A passenger on the train in question testified that he left it at about four miles from the place of the accident, and observed while walking home that the weather was clear, neither dark, nor stormy, nor foggy, at the place where he left the train, but could not state the condition of the weather exactly at the place of the accident. The engineer of a freight train, which had passed over the road about three quarters of an hour before, reported the weather clear at the place of striking the horses, but testified at the trial that the weather was stormy and misty. It appeared from the testimony of the fireman and engineer, that said horses were up and moving when the train approached, and also appeared, beyond reasonable doubt, that said passenger train struck four horses at the time in question; that the distance from where the first horse was found to the last one was over eight hundred feet, and the distance between the first horse and the second horse, as found, was more than five hundred feet, and they were all so mangled, cut, and broken in their limbs and bodies that they could not reasonably be presumed to have moved from the places where they fell after being struck. *Held*, that the evidence was sufficient to support a finding by the jury that there was negligence on the part of defendant's engineer, in that he made no effort to stop the train, or frighten the animals from the track before striking them. (DE WITT, J., dissenting, and for his view of the evidence see his opinion.)

SAME—*Same—Instructions.*—An instruction in the case at bar that it was "the duty of the engineer to keep a look out for obstructions on the track, and to use all appliances at his command to avoid accident; that if he failed to see an animal when he should see it, and thereby injured it, or if, seeing it, he does not use the appliances at his command to avoid injuring it, then the company is liable," is not objectionable as being too general, where the evidence was conflicting as to whether the weather was clear or foggy at the place of accident, and the engineer had neither made any effort to stop the train nor to frighten the animals from the track.

CONTRIBUTORY NEGLIGENCE—*Grazing on public domain.*—The owner of stock killed by locomotive is not guilty of contributory negligence in turning them out to graze on the public domain in the vicinity of the railroad.

*Appeal from Third Judicial District, Deer Lodge County.*

Action for damages.    The cause was tried before Durfee, J.
Plaintiff had judgment below.    Affirmed.

*J. S. Shropshire,* for Appellant.

This action is based upon the statute in force prior to the Act
of March 2, 1891, and comes clearly within the rule laid down
in the case of *Bielenberg* v. *Montana Union Ry. Co.* 8 Mont.
271.   So that if there was no neglignce on the part of the
defendant directly contributing to the killing of the animals,
and especially no negligence on the part of its servants in the
handling of the train — in other words, if the defendant was
in the exercise of ordinary care, and the killing of the animals
resulted notwithstanding, then there is no liability.   The jury
found that the defendant was negligent in not keeping the gates
closed and locked.   There is no warrant for any such finding
either in the pleadings or testimony.   Keeping the gates locked
would have deprived the land owner of their use, and would
have annulled the object of permitting them to be placed there.
Even if this had been an issue made by the pleadings, the testi-
mony does not warrant the finding.   These gates were used
exclusively by the farmers, and they were invariably left open
in the night time, as shown by the testimony of the section fore-
man, who says that upon nearly every morning he found them
open.   Had it been incumbent upon the defendant to keep these
gates closed, it would have required a constant guard night and
day.   No such duty is imposed by the law.   These gates being
private gates, used by the land owners for the purpose of a
private crossing of the track, the defendant is not liable for
stock killed which may get upon the track by reason of the care-
less use of the gates by farmers, in the absence of direct negli-
gence resulting in the killing.   A railroad company is under no
obligations to keep private gates in repair.   (*Evansville etc.
R. R. Co.* v. *Mosier,* 114 Ind. 447; *Louisville etc. Ry. Co.* v.
*Etzler,* 119 Ind. 39; *Yazoo etc. Ry. Co.* v. *Brumfield,* 4 Southern,
341, Miss. April 23, 1888.)   There is no testimony as to the
manner of the killing, or the circumstances attending it, except
as given by the train men of the two trains.   But this testimony
is uncontradicted.   It may as well be conceded that the weight

given to the testimony of train men, by a jury, is generally very slight. Nevertheless, as a matter of law, the uncontradicted testimony of train men is effectual on the particular point testified to, and it should be so. (*Huber* v. *Chicago etc. Ry. Co.* 6 Dak. 392; *St. Louis etc. Ry. Co.* v. *Basham*, 47 Ark. 321; *Georgia etc. R. R. Co.* v. *Harris*, 83 Ga. 393.) The instruction given by the court as to the duty of the engineer is too general when taken in connection with the particular circumstances attending this case. There was no reason for the stoppage of the train; the damage had been done, and it could not have been avoided under the circumstances. Under the instructions of the court it was his duty to stop the train nevertheless, and the only excuse for not stopping which he could offer, was the consequent danger to the train and passengers. The court in this instruction ignores the fact that the testimony of the engineer is uncontradicted, and that it was to the effect that it was impossible for him to see the animals in time to stop before striking them. The instruction does not refer to the fact that it was in the night time, or that it was dark and foggy, or that the train was running upon schedule time at an ordinary rate of speed. These are facts uncontradicted, and on this testimony alone the verdict for the plaintiff should be set aside. (*Georgia etc. R. R. Co.* v. *Harris*, 83 Ga. 393.) It is not negligence for a railroad company to fail to keep a lookout for stock. (*Memphis etc. R. R. Co.* v. *Kerr*, 52 Ark. 162; 20 Am. St. Rep. 159.) Where the law provides that the mere killing of stock constitutes *prima facie* negligence, this creates no new liability, but merely changes the order of proof. (*Huber* v. *Chicago etc. Ry. Co.* 6 Dak. 392.) The statute provides a penalty for knowingly leaving any gate open, leading into or out of any enclosed premises; hence it is unlawful to do so. (Comp. Stats. 582, § 275.) The railroad company's track and right of way were enclosed premises within the meaning of this statute, and there can be no question but that this statute was violated by the parties using these gates. The record does not show that the plaintiff ever used the gates and left them open, but the defendant had a right to assume that the gates would be kept closed and that no cattle would be upon the track at the point where these were killed. The principle must be the same, as if there

had been a law prohibiting this stock from running at large, and they were killed while so at large, even though they may have been at large without the fault of the owner. There would be no liability in such a case, if the killing resulted from no negligence on the part of the railroad company. (*Leebrick* v. *Republican Valley etc. R. R. Co.* 41 Kan. 756.) It was error for the court to instruct the jury that the plaintiff had a right to pasture his domestic animals on the "unenclosed lands of the State," and if the jury found that "they were being so pastured, and casually, without any obstructions in the way, strayed upon the track and were carelessly killed by the defendant," then the plaintiff in permitting his horses to run at large and pasture upon the unenclosed lands, would not be guilty of contributory negligence. There is no testimony whatever to the effect that there was any unenclosed land or public domain in the Deer Lodge Valley in the vicinity of the killing of these animals.

*Theodore Brantly*, and *W. H. Trippet*, for Respondent.

Counsel cited: American Digest, 1889, § 575, p. 3295; American Digest, 1891, § 641, p. 3835; *Missouri Pac. Ry. Co.* v. *Gedney*, 44 Kan. 329; 21 Am. St. Rep. 286; *Cox* v. *Burlington & W. Ry. Co.* 77 Iowa, 478; 2 Shearman & Redfield on Negligence, § 430; *Georgia R. R. & B. Co.* v. *Wall*, 80 Ga. 202; Sackett's Instructions to Juries, § 11, p. 388; *Fant* v. *Lyman*, 9 Mont. 61; American Digest, 1890, p. 3264, §§ 627, 634; *Renshaw* v. *Switzer*, 6 Mont. 464.

HARWOOD, J. — Action to recover damages for the alleged killing of four head of horses by the negligent and careless running of an engine and cars against and over them by defendant's agents and servants in the operation of its railroad. Defendant answered plaintiff's complaint, not denying the killing of said animals, as alleged, by the running of defendant's engine and cars against and upon them, but denying that the injury happened through the negligent or careless conduct of defendant or its agents or employees in the operation of its railroad. And for a further defense defendant alleged that such injury happened through plaintiff's own carelessness, which contributed thereto. Upon these two points of issue, as we are

informed by appellant's brief, the cause was tried. The jury returned their verdict in favor of plaintiff, assessing damages in the sum of seven hundred dollars. Defendant moved for a new trial, which motion was overruled, and appeal was taken.

The main proposition to be considered upon this appeal is whether or not the verdict is supported by sufficient evidence. Appellant contends that it appears from the evidence that the killing of said animals happened through unavoidable accident, without negligence on the part of appellant; or, as appellant's counsel states the proposition, " if defendant was in the exercise of ordinary care, and the killing of the animals resulted notwithstanding, then there is no liability ; " and appellant contends that the evidence shows the state of facts involved in this premise. On the other hand, respondent insists that the verdict is supported by the evidence, which he asserts shows negligence and carelessness attending the killing of the animals in question, and that respondent in no way contributed thereto. It appears that the killing of said animals happened near a place called "Kohr's Siding," on the line of defendant's railroad in Deer Lodge County. Plaintiff resides about five miles distant from that place. The horses in question were turned out by plaintiff to graze upon the commons in the vicinity of his ranch; and between 2 and 4 o'clock on the morning of September 24, 1890, they were killed at the point aforesaid, by being struck by an engine and train of cars running over defendant's railroad. It appears to be conceded that said stock went upon defendant's railroad track without the fault or negligence of the plaintiff (leaving out of consideration now the point made by appellant that the turning of said stock loose upon the commons amounted to contributory negligence on the part of plaintiff). The evidence shows that the railroad company had enclosed its right of way at the place in question by a fence; but it is also shown that at said place the lines of said fence were severed by gateways, and the evidence seems to be quite conclusive that such gates were broken down, and lying on the ground, or at least open so as to admit of stock passing freely through the fence upon said railroad track at the time in question. . Appellant insists that such gates were opened or broken down by others than its agents, and without its knowledge or permission; but

it is not contended that plaintiff was in any way guilty of open-
ing said gates, or carelessly leaving the same open.  The testi-
mony of plaintiff's witnesses tends to show that said gateways
were, and had been for some time prior to the killing of said
animals, left open.  The testimony of defendant's section fore-
man is to the effect that for some time prior to the killing of
said animals, said gates were found open almost every morning,
and were often closed by the section men of defendant; and that
said gates were found open on the morning after the killing of
said stock.  Said section foreman, in giving his testimony, said :
" I suppose the horses got through on to the track by means of
the open gate.  I found the gate open. . . . . The gate on the
east side was thrown out. . . . . The right of way fence along
there was in good shape.  I saw no evidence of the horses hav-
ing come through anywhere except at the gate."  He drew a
diagram showing to the jury the situation of the railroad there,
the side track, the crossing, and the two gates.  Said gates
appear from the testimony of this witness to have been used
principally by one Moreau, although it is also shown by all
witnesses questioned upon that point, that said gates were the
only way by which patrons of the road got access to said station
with teams, and that said gates were used for that purpose.  On
being asked if he ever said anything to Moreau about keeping
said gates closed, the section foreman of defendant testified as
follows:  " Yes, sir, I spoke to him after the horses were killed,
but not before that.  Since the horses were killed the gates have
been in good shape.  After the killing I went to work and fixed
the gates.  I fixed it permanently, the same as it is to-day, and
it has never been bothered since.  It has been locked now for a
month.  I suppose Mr. Moreau put the lock on.  I told Mr.
Moreau if he did'nt keep the gate locked, or keep it closed,
that we would have to nail it up, and since then he has locked
it with a chain and padlock. . . . I found the gate open almost
every morning when I went down there until this killing.  I
would stop and get off and close them.  I did that every morn-
ing."  On being asked whether persons " in using the side track
there did not have to use those gates in order to get to the side
track," the witness replied : "I suppose they did.  That was the
only way unless they pulled down the fence."  He was asked

the following question: "And weren't those gates used for the purpose of people going into the side track to load and unload?" and answered saying: "That was the only way to get in there. It answered for both purposes, I suppose." Again, he says in his testimony: "It was after this killing that I got after Mr. Moreau about the gates. I hadn't gotten after him before that that I know of."

The above statements were made by said section foreman while testifying as a witness on behalf of the plaintiff. He was also called by defendant, and described said right of way fence. In this connection he said: "My duty is to see that the fences and gates are kept in good shape. The gates were all right until after the accident. I never had occasion to repair the gates before that. It was all in good condition. I have had occasion to close them several times. Almost every morning I went there I closed them. It was my duty to run over the track and see that everything was in good shape, and then come back and go to work. Almost every morning when I came down I found the gates open. I found them open, and closed them very often." He further said: "I never called Mr. Moreau's attention to those gates before the 24th of September, although I found them open very often. I suppose they go through those gates to get to the siding to load and unload cars. That is the only way they can get there unless they pull down the fence. It is a fact that when cars are left there on the siding to be loaded, that they make use of those gates for the purpose of loading the cars. That is the custom."

Defendant introduced its superintendent of bridges and roadmaster as witness on its behalf, who in the course of his testimony said: "It is my business to look after the fences, gates, crossings, etc., and keep them in shape as much as possible. Almost all the main line is fenced in."

A considerable portion of the record is occupied in the recitation of testimony of witnesses concerning the condition of said right of way fence and said gates. Testimony on this subject was brought into the case by plaintiff and defendant, and not a single objection or exception appears by the record to have been made thereto by either party during the trial.

The jury was asked by defendant to return special findings,

and, among others, it was asked to find by what act or default defendant was negligent in killing said animals, if such killing was found by the jury to be attributable to the carelessness or negligence of defendant. In answer to this, the jury stated, among other things, that defendant was negligent in not keeping said gates closed and locked. This finding is complained of as unreasonable, and not founded upon evidence. And further, that there was no foundation laid in the pleadings for the introduction of evidence on that subject. There being no law requiring defendant to fence its right of way sufficiently to keep stock from going thereon, defendant's view of the case is no doubt correct in assuming that plaintiff could not rely upon any such duty on the part of defendant, nor rely upon the fact that said railroad right of way was not enclosed, to involve defendant in liability for killing the stock in question. There was, however, much evidence introduced in reference to said fence, and without any objection by either party. Plaintiff does not contend that it was the duty of defendant to keep its right of way enclosed so as to prevent stock from going thereon, nor that, by reason of the absence of such enclosure, plaintiff could recover for the injury alleged; but defendant had alleged in its answer that: "Such killing and destroying was the result of plaintiff's own carelessness contributing thereto, for which this defendant was in nowise responsible." This allegation was denied in plaintiff's reply. Now, it does not appear on what theory so much evidence was brought into the case concerning said fence and gates. How could it appear on what theory that evidence was brought in if both parties acquiesced in bringing it into the case, and did not even make an explanation of its bearing on the pleadings? It may have been introduced under the allegation of contributory negligence to show that plaintiff's stock broke through a lawful fence, and thus came upon defendant's railway track. It seems that defendant relied to some extent upon the fact of having constructed the fence, enclosing its right of way, as evidence of due care on its part in the attempt to keep stock from going thereon, and evidence was introduced as to the construction and keeping in repair of such fence by defendant. As against such evidence plaintiff introduced testimony tending to show the condition of

the gateways as above mentioned. On such theory it may have been justified by the pleadings under the allegation and denial of contributory negligence. No objection was made to said evidence, and no opportunity was given the court to pass upon the point as to whether or not it was justified by the pleadings. This evidence tended to present to the minds of the jury a state of facts by which it was apparent that when animals came along to such gateways they could freely pass in and stray along the railroad track, and having passed beyond the gateways, were then fenced in close to said track, so that they could not retreat to the open country on the approach of a train. Considering that this circumstance may have increased the danger to stock, as compared to no fence at all, and considering the further fact shown by the testimony of defendant's witnesses that said gates were subject to defendant's control, and that after killing the stock in question, defendant made and enforced a rule to the effect that if said gates were not kept closed and locked by those who had the privilege of using the same, the railroad company would fasten said gates as stationary parts of the fence; and that this rule had the effect of keeping said gateways closed ever since the killing of said stock. Considering further, that, if the conditions were such that said gates could not be kept closed, then open crossways over defendant's right of way, with the usual "cattle guards," to prevent stock from passing upon defendant's railroad, within the enclosure, could be provided, if necessary; and considering, in reference to what would be the exercise of due care under the circumstances, whether the arrangement last mentioned would not be less dangerous than that described as existing, and that the fact of said gates being often left open was known to defendant's agents and employees, who had control over them — considering these circumstances shown to the jury, we cannot say that its special finding, above mentioned, is unreasonable or groundless in its premise. It has been suggested that if defendant was under a duty to keep said gates closed, "there was but one effectual method" of so doing, "and that was to keep *a servant at every gate and place a guard over its entire property.*" In treating practical questions of this nature, the difference between ordinary care and diligence, which the law exacts, and unreasonable

extremity, which the law does not require, should be compre-
hended and kept in view; and it should not be forgotten in
considering the case at bar that defendant's own witnesses testi-
fied that it was the duty of defendant's agents and employees
"to see that the fences and gates are kept in good shape,"
which evidence we have quoted above; and further, that candor
must admit that the record shows that by a very simple and
reasonable effort on the part of defendant's agents "after the
killing," said gates had been kept securely closed. Plaintiff
was in no way responsible for the existence or continuance of
those conditions respecting said enclosure; and therein the case
at bar is entirely unlike the case of *Evansville etc. R. R. Co.* v.
*Mosier*, 114 Ind. 447, cited by appellant, in which the gateways
had been put in for the use of the owner of an adjoining pas-
ture, and it was held that such owner "for whose benefit a pri-
vate crossing is maintained, and who is supposed to be fully
cognizant of the condition of the gate, and the use to which it
is put, must, therefore, as between himself and the company, see
to it that the gate is kept in proper condition, and that it is kept
closed." We should unhesitatingly hold the same view in a
proper case. The case of *Louisville etc. Ry. Co.* v. *Etzler*, 119
Ind. 39, also cited by appellant, was determined under a stat-
ute, as appears by the statement, which provided that "owners
of land separated by a railroad may of right maintain crossings
over such railroad, and impose upon the owner the duty of
repairing and keeping up gates thereto, and that railway
companies, in the absence of negligence, shall not be liable for
injuring and killing stock at such farm crossings;" and it was
held that under said statute a railroad company was not liable
for injury to stock entering upon the track at such points, in
the absence of negligence on the part of the company or its
employees, and there was no negligence charged in that case.
Plaintiff, however, does not rest his case altogether upon the
circumstances shown to exist in reference to said fence and gate-
ways, but appears to have brought the same to view as circum-
stances bearing on the case, as against the proposition of defendant
that it had "maintained a good and sufficient fence on both
sides of its track, although it was not required to do so by law."
To meet the effect of that position plaintiff's counsel insisted

that the undisputed evidence showing the condition of said gates, and the failure of defendant to use reasonable care in keeping them closed, destroyed all force of appellant's position in respect to its having maintained a good and sufficient fence on both sides of its track. This was the position taken by counsel for respondent on the argument in this court, and to say that respondent's counsel abandoned that branch of the case in this court, is, we think, a misconception of the plain terms in which he met that point of appellant's attack on the verdict. It follows very naturally after asserting that respondent in this court abandoned all that branch of the case, to ask "why, under such circumstances, should the matter of the gates be treated as in the case?" This question at once betrays the error and unfairness of seeking to place counsel in the position of having abandoned that branch of the case. Is not the special finding of the jury as to negligence of defendant in carelessly leaving said gates open, the burden of appellant's brief and argument? Why, then, should we refuse a consideration of that assignment? If respondent's counsel did abandon it we could not rightfully refuse to consider that assignment which was urged as ground for a new trial. And, would it not be supreme folly for respondent's counsel to attempt to abandon a point which was urged as ground to annul his verdict, and which he could not abandon, but must face, as the court must consider whether or not it was ground for vacating the verdict? Appellant presented the finding of the jury as to the negligence of appellant in not keeping said gates closed, and assigned error upon it, and for that reason it happens that respondent could not abandon that part of the case so as to relieve this court of the duty to consider it. The reason for these observations will be apparent when all the views expressed by members of this court in this case are considered. As before observed, the evidence concerning said fence, produced by each party, was introduced without objection from either. For this reason we cannot sustain the proposition of appellant's counsel that no foundation was laid in the pleadings for the introduction of such evidence.

Passing to the other branch of the case it appears the jury found that there was negligence on the part of appellant's engineer of the passenger train, in that he made no effort to stop said

train before striking plaintiff's horses.   Appellant insists that
the evidence shows that at the time and place of killing said
animals the condition of the weather and the darkness was such
that defendant's agent and employees could not, by the exercise
of ordinary care and diligence, have seen such stock on the right
of way in time to avoid striking the same.   It was shown that
two trains passed over defendant's road during the night in
question—a passenger and a freight train—either one or both
of which may have struck some of said injured animals.   As
to the freight train, it is shown by the testimony of the engineer
and fireman, who accompanied that train, that as it passed along
the place in question said train struck one animal, and to the
best of their knowledge only one, which animal was shown not
to have been one of plaintiff's horses.   The testimony of said
witnesses is to the effect that said freight train was running
slowly as it passed said place where plaintiff's horses were
killed, namely, at the rate of about ten miles per hour; that
they observed an animal on the track lodged in the cross-ties
over a culvert; that the brakes were applied and the power of
the engine reversed, and said train brought to a stop just as the
engine reached and ran partly upon said animal; that they saw
other horses running away from the track, but they stated that
to the best of their knowledge said train struck no other
animal.   This testimony, in view of the fact that said train
was proceeding slowly, and came to a stop at said place,
would seem to come from witnesses who had quite favorable
opportunity to observe what happened, and it having been
shown that the animal struck by that train was not one
of plaintiff's horses, this testimony tends to show that the
killing of plaintiff's horses happened by some other means.
As we proceed with this consideration, it will become impor-
tant to find, if it can be ascertained from the record, at what
time said freight train passed "Kohr's Siding."   Said freight
train is referred to in the testimony of defendant's witnesses as
No. 9.   Its engineer, Smith, twice states the time said train
passed "Kohr's Siding" on the night in question.   Each time
time he states it as "about 2 o'clock, or somewhere in that
neighborhood."   The fireman who accompanied that train, Mc-
Duffy, also twice states the time it passed said place; once

stating said time to have been "between 2 and 3 o'clock," and at another time saying it was "about 3 o'clock." The conductor of said train thrice states the time it passed said place; in each instance saying No. 9 passed "Kohr's Siding" at 2:45 or 2:50 o'clock." These were all defendant's witnesses. The conductor of said freight train is the only one who states the time exactly, and considering his position, and that he repeatedly stated it the same, we think it fair to assume that he knew the time.

The passenger train in question was run northward from Butte to Garrison, during said night, and passed by "Kohr's Siding" at 3:35 o'clock of the morning in question. The testimony of the engineer and fireman who accompanied said passenger train is to the effect that when said train passed "Kohr's Siding" it was running at the rate of thirty-five or forty miles per hour; that, as this train passed said place, two horses were struck by it and thrown off the track, and that no other animals were struck by said train; that the animals struck were not observed in time to avoid running upon them, because the darkness was increased by fog or mist in the atmosphere at the time and place, and for that reason the engineer and fireman were unable to see as far as usual in front of the train; that, had the weather been clear, the engineer could have seen seven or eight car lengths in front of his engine, and with these conditions and the exercise of care he could have seen said animals and frightened them from the track by sounding the whistle, and avoided striking them; but because the night was stormy, and rain or mist was falling, and fog prevailing, the animals were not observed in time to sound a whistle before they were struck and passed, and therefore no whistle was sounded, or other alarm attempted. Appellant insists that the testimony of the engineer and fireman of said train, they being the only persons present at the moment of said accident, and observing the conditions, and being uncontradicted, as appellant contends, is therefore conclusive to the effect that the killing of said animals was purely accidental, and could not have been prevented by the exercise of due care. The testimony of the engineer and fireman of said passenger train should therefore be carefully reviewed, and considered in comparison with all the testimony and the circumstances surrounding the subject in question,

brought to light by the testimony of the other witnesses.  George Howe, engineer of said passenger train, in testifying on behalf of defendant, said: "I remember on that night, or the morning of the 24th, striking some animals near what is termed 'Kohr's Siding;' it was just 3:35 in the morning.  I struck and killed two head of horses. . . . . The road was straight before the curve was reached, and straight afterwards for a mile or so on the other side of where I struck the animals.  According to my judgment I struck the animals on the curve.  It was dark to the best of my knowledge.  I did not see the animals for any distance before I struck them.  I saw them about two car lengths ahead.  The reason I did not see them before was that it was foggy-like that night.  Another thing, I could not see any further, being on the right side of the engine.  I think I struck them on the curve.  I think it was on the curve.  As near as I can remember the curve is not very sharp, and it curves to the left as you go north.  My side of the engine is on the right.  If it was light, and the weather was good and clear, in going around that curve I suppose I could have seen six or seven car lengths ahead on the curve.  I was unable to make any effort to stop my engine and prevent the accident.  I didn't have the time.  My headlight was good."  Again, speaking of said animals, this witness testified: "I saw no other animals except the two I struck at the time.  Going at the rate I was, if I could have seen them and sounded my whistle it would have kept them out of the way.  If I could have seen them ten car lengths ahead, I judge I never would have struck them.  I could not have stopped in ten car lengths, but I could have given them warning enough to have gotten them out of the way.  I had air brakes fully equipped.  I did not have time to sound my whistle. . . . . If I could have seen the animals ten car lengths ahead I never would have struck them.  All cars are not the same length.  I presume ten car lengths would be about three hundred and fifty feet.  I should have slowed down so that I need not have hit them."  He further testified: "I could not distinguish them."  I only saw one.  My fireman saw the other one.  Both at the same time.  One of the horses went off on my side, and I asked the fireman if I had struck any on his side, and he said I had one.  They were together, I

presume." Again he said: "I struck the animals at about 3:35 in the morning. I had my headlight burning. I was over them and it was not necessary to stop. I threw them off the track. I could see the horses about two cars ahead. A car averages thirty feet. . . . . There is no particular thing that makes me remember that night from any other that I know of. I remember one of the horses striking the engine and scaring me pretty badly, and I remember the night from my reports I made out to my division superintendent."

The fireman who accompanied the same engine, Nelson Bostwick, was called on the behalf of defendant, and in the course of his testimony, stated: "I was firing for Mr. Howe on the occasion of the striking of these animals on the 24th of September last. I first saw the animals about two car lengths of the engine. The engineer did not make any effort to stop the train and prevent the accident, because he did not have time to do so. He went over them so quick. I remember where Kohr's Siding is. With reference to that siding we struck the animals about a quarter of a mile south. I remember the curve at that point. In reference to the curve it was just where we were going off from it that we struck them, as near as I can remember. . . . . The night was very dark, and it was kind of foggy at that particular place. At that time, as we were going out of that curve, if it had not been foggy, we could have seen over two telegraph poles in advance of the engine. We could have seen further if it had been on a straight track. That is as far as we could have seen, even if it had not been foggy. The fog was of an ordinary density. . . . . At the time we struck the animals we were going at the rate of about thirty-five miles an hour. . . . . We only struck two animals, that is all we saw. I could not tell exactly in what distance a train going at the rate of thirty-five miles an hour, and well equipped with air brakes, could have been stopped, if we had seen the animals, but we could have stopped within forty or fifty rods, that is probably the outside, but it might have been stopped a little sooner. I saw those horses just at the curve; they were both together. As near as we could tell, we struck them both at the same time, or right within an instant of one another. It threw them off the track, one of them going

off on my side and one on the engineer's side. At the time we saw the animals they were both on the track, that is, between the rails, about two car lengths away. I don't think they were running at the time. They had apparently either been lying down on the track, or had just gotten on the track. They made an effort to get off, but we caught them before they could get off. We threw them both off nearly the same place, or within a few feet of one another. We were both on the locomotive, that is, I was, and I suppose he was. In going through the curve I could have seen the stock about two telegraph poles ahead if it had not been foggy. . . . . I couldn't tell what made the fog. It had been misting all the way down, a fog or mist, if you want to term it so. When it is misting it is generally raining a little. . . . . I think the difference between two telegraph poles is about one hundred and eighty feet. Take the poles at the ends and the one at the center, and it would make three. On a clear night I could have seen that distance. . . . . I didn't have time until after we hit them to ring the bell. Just before we struck the horses the whistle was blown for the station. We always blow the whistle for a passenger station. Kohr's Siding is a passenger station. It is termed a station on the railroad rules, and it has a name."

Other testimony was introduced by defendant to the effect that the weather was stormy, and rain or mist was falling, and fog prevailing at the time in question. Testimony was also introduced by defendant that there was some curvature of the railroad track at the place in question, but it is not shown by such testimony how the view of the engineer is obstructed by reason of such curvature. The testimony introduced by the plaintiff is to the effect that such curvature is slight, and, notwithstanding the same, the track lies in plain and unobstructed view approaching from either direction to the place where said animals were killed. McMaster, the plaintiff, in testifying as to said curve in the track, said: "There is very little curve there; it is almost straight." He was corroborated by one of defendant's witnesses, McDuffy, who testified: "It is not a very quick curve. It is little curved there, and after you strike the curve it is almost straight track going north." Plaintiff introduced testimony tending to prove that early on

the morning following the killing of said animals there were no visible signs of rain or mist having fallen during the night previous, there being no dampness then visible on the ground, vegetation, or other objects, at that place. It appears that the examination was made by Byron Woods, a farmer, who testified at the trial that some of his men were threshing grain at his neighbor's stacks, and said: "I know it didn't storm during the night, because my stacks showed no rain on them on the morning of the 24th, and they commenced on the 25th." Again, in his testimony, he said: "There was no storm. I am sure of that. The section boss spoke to me about the horses on the morning of the 24th, when I went out to the ranch." He testified that he thought he rose about half past five o'clock that morning. An attempt has been made to cast discredit on the testimony of this witness because he said in his testimony that he thought daylight would be showing between 2 and 3 o'clock in the morning at that time of the year, therefore, it is but fair to quote the witness' own statements on that point. They are recited in the record as follows: "I should think daylight would be showing between 2 and 3 o'clock in the morning at about that time of the year, though not very much perhaps at that time of the year. But I should think daylight would be showing a little at that time of the year at 2 or 3 o'clock in the morning." There is nothing positive in his statement on this point. He seems to have stated it in such a way that no one would regard it as more than his impression, not pretending that he had made special observation. No evidence was offered to show that said observation is untrue. It is merely mentioned in a spirit of disparagement, as though he was unworthy of belief because of that statement, which perhaps is not justified, considering the caution with which the witness spoke. Common observation, too, may show to those who care to observe, that in this altitude, and usually clear atmosphere, twilight holds on in the evening to a surprisingly late hour, and the appearance of dawn also is visible at a surprisingly early hour. Perhaps the farmer has observed this. Those who criticize the statement of a witness should at least be willing to venture the assertion of some fact on which to rest such criticism. The jury was the judge of the credibility of witnesses in this case.

Plaintiff produced a witness who testified that he rode from Butte on said passenger train, on the morning in question, and left said train at Deer Lodge, about four miles from Kohr's Siding. This witness testified that he observed the weather particularly at that time, as he left the train and walked towards his home, and that it was clear; that said train passed Kohr's Siding between 3 and 4 o'clock; that the weather was not stormy, and it was not dark, nor was any fog prevailing when he left said train at Deer Lodge; that he observed the weather particularly when he left the train at Deer Lodge; that he was unable to state positively the state of the weather at Kohr's Siding, but could state that the weather was clear a short distance from there. Plaintiff also introduced a report in writing, made by Smith, the engineer of said freight train, which passed along by Kohr's Siding at 2:45 or 2:50 o'clock on the same morning, in which said Smith reported the striking of the horse found over the culvert, and in which report he stated that the weather was clear at the time and place of striking said animal. Said Smith testified at the trial, however, and in his testimony stated that the weather was "stormy, rainy, and misty," at the time said freight train passed Kohr's Siding. McDuffy, the fireman on the engine of the freight train, in describing the condition of the weather at Kohr's Siding when said freight train passed that place, stated that "there was a slight fog that would hinder your sight to a slight extent. It was not so very dense." And in another part of his testimony, he says of the weather at the time, "There was a slight mist at Kohr's Siding as we passed there."

Plaintiff's horses were found lying beside the track, bearing the appearance of having been struck by a passing train; and the position which these animals occupied as respecting one another, when found, was shown to be as follows: Proceeding northward in the same direction in which said passenger train was running, the distance from where the first animal was found to the last was shown to be about eight hundred feet; the distance between the first and second being more than five hundred feet.

As to the position of said animals when found by said section foreman, he testified: "I remember finding some horses killed about the morning of the 24th of September last. There were four horses and a colt. I killed them when I found out that they

were so badly mangled that they could not live. I killed and buried them. I found them down in the ditch. The first one was about the middle of the curve. Then there was another on the other side, about a couple of telegraph poles ahead of it; that was a mare. Then came the colt, and then another mare on the other side. Then at the bridge I found a horse." It appears said section foreman made a report in writing of said animals, as found by him, which report was introduced by plaintiff as evidence in this case, and shows, among other things : "One bay horse, cut in two ; one bay mare, three legs cut off; bay colt, back and hips hurt; one bay mare, legs cut off; one bay mare, legs broken." This report evidently includes the fifth horse found in the ties over the culvert, which is not concerned in this case. If all these animals were thus injured, and "down in the ditch," and "so badly mangled that they could not live," and the section foreman therefore killed and buried them, as he testifies, it is not likely that any of them were found very far from where they fell after being struck by the train. It is shown beyond any reasonable question that said passenger train struck and thus injured plaintiff's four horses.

Now, in connection with the testimony of the engineer and fireman of that train, on whose testimony it is asserted the railroad company must be dismissed as without any fault, the above testimony of the section foreman should be noticed. First observing that it is testified and not contradicted, that the curve in said road at the point in question is but slight; that it was almost straight. The section foreman, who found said horses, was called for both plaintiff and defendant. He was in charge of this section of the road. He buried said horses and afterwards they were dug up by plaintiff's order, so that said foreman ought to know in what position he found said horses, relative to said curve, and to one another. It was a slight curve, and he found "the first one about the middle of the curve, and there was another on the other side, about a couple of telegraph poles ahead of it." (It is shown in evidence by defendant's witnesses that the distances between telegraph poles is about one hundred and eighty feet, and if by a couple of telegraph poles he means double that distance, his statement is not far from agreeing with plaintiff, who measured the distance

from the first to the second horse, and found it over five hundred feet.) "Then came the colt, and then the mare on the other side, then at the bridge I found the horse," says said foreman. He mentions said animals from one to the other, going northward, the same as plaintiff did in giving the distances between them. Does this evidence of defendant's foreman have any bearing on the testimony of said engineer and fireman of said passenger train, which evidence of the latter witnesses it is insisted the jury and trial court, and this court, should take as conclusive, and dismiss the defendant? Of course, it was the duty of said engineer and fireman to run said train with due care, so as to avoid involving their employer in damages resulting from their carelessness or negligence. In this respect, their conduct as to whether they were faithful and trusty agents was on trial in the case at bar. In their testimony they asserted that said passenger train struck *only* two horses, and that these two were struck about the same instant, and they say they were knocked off the track. They do not pretend that said animals, or any of them, were dragged along by the engine. According to their testimony, said animals were struck and passed so quickly, not even an alarm could be sounded. They ought to know something about what occurred, considering they had a good head-light, and could see sixty feet ahead of the engine, according to their admission. The fireman said the train struck two horses just as it was going off the curve. The engineer said, "According to my judgment, I struck the animals on the curve." Now it is proved beyond a reasonable doubt that no other than said passenger train struck plaintiff's four horses, although these witnesses say that said passenger train struck only two. Bearing this in mind, it should be observed, that if said engineer and firemen were mistaken as to the number struck, they ought to know whether they struck them all at about the same instant, for they could perceive this by feeling the shock of striking animals of that proportion, as well as seeing. If what they say is true as to having struck what they did encounter at the curve, and knocked them off the track, would not said four horses have been found at the curve — the animals were shown to be too badly mangled, and in such a way that it is not likely any of them moved beyond where they

fell—instead of three being found beyond the curve, one over eight hundred feet beyond the first one? Or, viewing the testimony of said engineer and fireman in another way (we ought to reconcile it upon the theory that it is substantially true, if we can): They say they encountered only two horses, and struck them at the curve, and struck both at about the same instant. They were mistaken in the number, because there were four; and mistaken as to throwing them off the track where struck, as the circumstances show. They should not be mistaken as to striking whatever were struck at about the same instant, instead of one at a time consecutively, and hundreds of feet apart, for they had the aid of both the sense of sight and feeling to make them sure about this fact, and if any fact they stated was free from mistake, this should be. They made this fact positive and prominent all the way through their testimony. The same idea is involved in their statement that they struck and passed said animals at an instant, and before even an alarm could be sounded; this excludes the idea that they struck them separately and at considerable distance apart, and emphasizes their positive statement that the horses they struck were encountered at about the same instant. So taking this statement as true, there were four horses in number struck, and the engine either threw or carried three of them more than five hundred feet, and dropped one; carried two of them nearly seven hundred feet, and dropped another; and carried one over eight hundred feet before dropping it. When the proportion of ordinary horses is remembered, and the nearness of their bodies to the earth when struck by a railroad locomotive is considered, and then these distances are considered, and it is realized that one hundred feet is far more than the width of our ordinary streets, and that even the space of an ordinary city block must be more than doubled to reach the distance which two of these animals were thrown, if it is to be believed the engine threw them to the places where found, would not the average mind demand experimental proof that such marvelous results occur where an engine strikes such animals, going at an ordinary rate of speed? No such proof was given. Are engines built for gathering up and carrying animals of that number and proportion, when it happens to encounter them on

the track?  Or, are railroad locomotives built so as to throw
animals off, as the engineer and fireman said was the case in
this instance?  If the engine threw said animals off the track
as it struck them, as the engineer and fireman assert, is it likely
that it struck them simultaneously, as said witnesses assert?
If the engine struck them all at about the same instant, as the
engineer and fireman testified, then the engine threw or carried
three of them along as aforesaid.  Again, does the engineer or
fireman know when the engine strikes such animals as those in
question, so as to mangle and throw them into the ditch as
shown, especially when such engineer and fireman are furnished
with a "good headlight," and can see "sixty feet ahead?"  If
not, they should not speak so positively as to what happened,
or declare positively that nothing else happened.  If they knew
what happened so well they should have honestly said they
struck four horses, as the evidence shows beyond doubt, instead
of trying to further mystify and obscure the truth by seeking
to make it appear that there were only two horses struck by
said train.  What could have been the purpose of this except
to shield their own conduct from blame before their employer?
If they did not know so perfectly what happened they should
have honestly admitted it.  The jury undoubtedly saw the con-
tradiction and absurdity involved in their testimony, both in
substance and in its tendency, when compared with undisputed
facts and circumstances shown in the case.  The court undoubt-
edly saw the same thing, and refused to disturb the verdict of
the jury.

It has been sought to introduce into the judicial consideration
of the evidence in this case a remarkable philosophic theorem
and conclusion in respect to the effect of the curve in said rail-
road track mentioned in the evidence.  The witnesses all admit
that said curve was slight, the road approached it on a straight
line, made a slight curve, and proceeded in a straight line again.
Without any statement of witnesses in the record to the effect
that the curve in said track was such as to cause the path illu-
mined by the headlight to depart from the track, leaving the
track in the dark for any distance whatever, that theory has
been sought to be imported into the judicial consideration here.
The premise is: *First.* There is a slight curve in the track at the

place in question. It is not great, for no witness has ventured to assert that, and we have seen what is asserted on the contrary. The *second* proposition in the problem is : That no evidence was introduced showing that invention had mastered the feat of compelling rays of light to travel through the atmosphere on a curve. So we have given : *First.* A slight curve. *Second.* No appliance to cast rays of light around the arc of a circle. Conclusion : Hence, it must be taken " as true that the light from the headlight of said engine shown on right lines, and if the curve went to the left, the track left the area of illumination ; " and that " naturally the engineer's observation could not extend as far along the track as it would if the track were straight, so that the light would shine down in a straight line." Of course, no witness ventures to swear as far as the record discloses that the conditions were such at the time and place as to produce said effect. To ask for such proof may, in the view of some minds, betray the most profound stupidity, as though one should call for proof of the effect of the laws of nature ; but still, we will venture to ask further : If, before affirming the above conclusion as inevitable, a philosophic judge should not remember that rays of light radiate from its source, and illuminate according to the strength of the light in all directions, if allowed ; and that rays may be reflected from a lamp in straight oblique lines, as in the case of the headlight of a railway locomotive, so as to illuminate a path much wider than the mere ties and track ; and that, while a slight curve might shift the illuminated path so that more of it would be on one side of the track than the other, yet, might not the track remain fully illuminated? According to the theory proposed, the engineer would be in darkness very much of the time, and liable to helplessly plunge into disaster wherever the road had a number of even slight curves. Possibly the inventor of railroad appliances has not set such narrow bounds to the path illuminated by the locomotive headlight, even though he could not devise means to compel rays of light to follow the arc of a circle. He may have found it quite easy to allow the rays from the lamp to be shed upon a space wide enough to illuminate a *slight curve.* There is no doubt a curve might be of such degree that in turning it the rays from the headlight would be thrown entirely away from the track beyond. But, would it

not be safer and more judicial in determining a given case to wait until it is shown by proof that the conditions are such as to produce that result?   Railroad companies are generally represented by counsel among the ablest in the ranks of the profession, and if such conditions really existed, would they not introduce into the case proof thereof by at least showing the degree of the curvature and the width of space illumined by the headlight, and thus lay the foundation for the consideration of such conditions?   Would it not be safer and more judicial to stay by the record, and consider those facts and conditions which are shown by the evidence in the record, lest we run into delusive theories and conclusions which have no application to the case under consideration, and thus endanger, rather than aid, in securing the rights of litigants whose cases come within our jurisdiction?

It is clearly shown what might have been done by the exercise of ordinary care toward preventing the destruction of said animals if the weather was clear, and from these facts it appears that, in case the weather was clear, it is very likely the destruction could have been prevented by the exercise of due care.   The testimony of the fireman accompanying said passenger train is to that effect: that said stock was up and moving and that no alarm was sounded, and no effort made to stop or reduce the speed of the train.   The evidence is conflicting as to the state of the weather at the time and place in question.   The jury had before it the testimony of Patterson, who rode on said passenger train from Butte to Deer Lodge, which was to the effect that the weather was clear a short distance from the particular place where said animals were killed, and that it was not dark at the time, being about 3:30 o'clock of a September morning.   There is no dispute about the time said train passed "Kohr's Siding."   The report of the engineer of the freight train, which passed the place at the hour of 2:45 or 2:50 o'clock of the same morning, was to the effect that the weather was clear at said place and time.   This report was made immediately after the occurrence, and engineer Smith, in his testimony, makes no explanation as to his having wilfully misstated the condition of the weather in said report, or as to his having been mistaken in such statement.   The report was made to the

superintendent, was a formal statement of the conditions and circumstances attending his striking the animal in the culvert, and the question as to the state of the weather was distinctly asked, and the answer was set down. The testimony of the other witnesses was to the effect that early on the following morning there was no indication of rain or moisture having fallen during the night previous. Some of appellant's witnesses testified that a fog prevailed in spots, or "banks of fog," in low places, and that one of the alleged "banks of fog" prevailed where said animals were killed at the time of striking them. Counsel for appellant insists that the weather may have been clear a short distance away, and nevertheless foggy at the time and place said animals were killed. If this condition was in fact true (although defendant's witnesses are not in harmony on that point), it is then made to appear by the theory of appellant's counsel, that the parties in charge of said passenger train run the same through a mere "bank of fog," without the precaution of sounding a whistle, at the same high rate of speed which might be proper if the view was clear — at such a rate of speed that there was no escape for stock which happened to be upon the track, although such animals were moving when the train approached — so fast that there was no time to even sound a whistle before the destruction was accomplished and passed by. The jury did not adopt the theory of appellant; and investigation of the evidence shows to us that there is testimony tending to lead to a different conclusion. We cannot, therefore, sustain the assignment that there is no evidence to support the verdict.

Appellant requested the court "to charge the jury that the testimony as to the circumstances of the killing of said animals was uncontradicted; that it was to the effect that the killing was an unavoidable accident, and that it failed to show negligence on the part of the train men, and that the jury should so find." The court refused to so instruct the jury, and appellant assigns such refusal as error.

This request is based on the theory of the case, and the showing of the evidence contended for by appellant, which we have been unable to find, borne out by our investigations thereof, and therefore must conclude that the court committed no error in such refusal.

The court gave the jury an instruction to the effect that it was the "duty of the engineer to keep a lookout for obstructions on the track and to use all appliances at his command to avoid accident; that if he failed to see an animal when he should see it, and thereby injures it, or, if seeing it he does not use the appliances at his command to avoid injuring it, then the company is liable, unless it appears from the circumstances surrounding the case that the use of these means to stop the train would injure the lives of the passengers." Appellant complains that "while such instructions may state the law correctly, as a general rule, it certainly is too broad when taken in connection with the particular circumstances attending this case." We think this, and the other instruction complained of by appellant, fall under the same observations which we have made as to the refusal of the court to give the instruction requested. The complaint being based on his view of the evidence, which we have been unable to adopt.

Appellant argues that respondent committed an act amounting to negligence, which contributed to the destruction of said horses, by turning them out to graze on the public domain in the vicinity of his ranch. We cannot concur in this proposition. Stockraising, by utilizing the vast open ranges of this country, is, and has been since its settlement, one of the principal industries which contributes to the prosperity of the common carrier as well as to the individual citizen. Numerous statutes have been passed, from time to time during the history of Montana, regulating the industry of stockraising, and clearly recognizing and sanctioning the matter of allowing stock to graze on the public domain as proper and lawful. The whole theory of the general legislation of this State is against the proposition advanced by appellant's counsel. It is our opinion that the judgment ought to be affirmed.

Blake, C. J., concurs.

De Witt, J. (*dissenting*). It is claimed that negligence by defendant is shown in two respects: —

1. In not keeping the gates mentioned closed and locked. In the complaint the negligence alleged is as follows: "That the said defendant, by its agents and servants, not regarding its

duty in that respect, so carelessly and negligently ran and man-. aged said locomotive and cars on the said twenty-third day of September, A. D. 1890, that the same ran against and over the said horses of the said plaintiff, and killed and destroyed the same." This is denied by the answer. Negligence in leaving the gates open or unlocked is not mentioned in any pleading in the case. It is not the cause of action set up in the complaint. Defendant was summoned to court to answer for damages alleged to have been caused by operating its locomotive and cars. The jury found that it was negligent in this respect. But of this hereafter. They also found that the defendant was negligent in a wholly different matter, i. e., in leaving some gates open and unlocked. The respondent's counsel recognized that the jury had gone outside of the case, and found damages for an act that plaintiff had not complained of in his pleading, and had not made his cause of action. Counsel, therefore, on his argument on the appeal, stated that he abandoned any claim that his verdict should be sustained by virtue of the finding of negligence as to the gates, or the evidence in that behalf. Why, under such circumstances, should the matter of the gates be treated as in the case? The defendant was under no obligation, by law or con- tract, to build or maintain a fence along its right of way. This action arose before the act of the last session of the legislature. It seems, however, that it did build and maintain such a fence. It put in these gates at the request of and for the accommodation of the neighbors at this point, not for any use of its own. It would not seem that building the fence and putting in the gates was negligence. The defendant did not use the gates, or in using them, leave them open. They were opened and left open by some one other than the defendant. That person is not shown to be the one for whose acts the defendant was responsible. The defendant's servants frequently voluntarily closed the gates when they found them open. Because they, without a duty upon them so to do, closed them whenever they found them open, was it negligence on their part that they did not always find them when they were opened by persons other than themselves? It seems to me not. But they were negligent in not keeping the gates locked and closed, it is held. If they locked them, and retained the key, the result would be the same as if there were

no gates, and I do not understand that it is claimed that it was negligence to build the gates. If they hung the key on the fence, or provided every passer with a key, the result would be the same as if there were no locking.

But as to keeping the gates closed: The place was in the country, away from any town. If it was the company's duty to keep the gates closed, there was but one effectual method of performing this duty. That was to keep a servant at every gate along the line (and the evidence shows that they were numerous), to close them after careless passers, who were strangers to the defendant. Is the defendant liable for such strangers' acts? If this be the law, the defendant must put a guard over its entire property to protect it from negligent acts of third persons, which negligent acts may result in injuries to others, and for which the defendant is to be held liable. I do not understand that such duty rests upon the defendant. The jury found that it did, to be sure; but respondent's counsel promptly abandoned any such ground in this court. In that I think that he was correct. I agree with him that in the matter of the gates no negligence was either pleaded or proved.

In *Sweeny* v. *Great Falls etc. Ry. Co.* 11 Mont. 523, the allegation of the complaint as to negligence was that plaintiff was working for defendant under defendant's car, and that defendant carelessly and negligently, and without any notice or warning to plaintiff, backed or ran an engine against said car, and set it in motion, and while so in motion by reason of said careless and negligent act of defendant, the car ran over plaintiff, etc. After a careful examination of the evidence in that case, this court held that there was a failure of proof that the defendant moved the car without warning, as alleged, and that, therefore, the evidence was insufficient to support the verdict. So in the case at bar, the allegation of the complaint is the negligence in running the locomotive and cars. Proof in reference to the gates does not tend to support the said allegation.

2. I will now examine the cause of action as alleged and relied upon by the plaintiff's attorney. The four horses were killed in the night between September 23 and 24, 1890. It may be taken as conceded that they were killed by defendant's passenger train No. 5, which passed Kohr's Siding, the place

of the accident, at 3:35 A. M.   The horses did not get on the track or right of way of defendant through any negligence of defendant.   It may be considered as conceded that they did not get there through any fault of plaintiff.   Under these circumstances, what happened?   Plaintiff's witnesses do not testify as to the facts at the time of the collision.   For those facts we must go to defendant's witnesses.   The train came along about its business at 3:35 A. M.   The track was near the river.   The engineer testifies that he was in his position on the right side of the cab.   That the track curved slightly to the left.   He was running at thirty-five miles an hour, which was not a dangerous or unusual rate.   His schedule time was thirty-five to forty miles an hour at that point.   The headlight was burning.   He saw one horse on his side, and the fireman saw one on his.   The engineer thinks that he struck the horses on the curve.   The night was dark and misty and foggy at the time and place of the accident.   He could not possibly see to exceed two car lengths, or sixty feet.   The train was equipped with air brakes, and the engineer had it under control.   He saw the horses about sixty feet ahead of the engine, on the track.   He was on the right side of the engine.   The track curved slightly to the left.   It is not in evidence that there has yet been invented any contrivance to make the rays of light travel through the atmosphere on a curve.   That being the case, I am obliged to take it as true that the light from the headlight shown on right lines, and if the curve went to the left, the track left the area of illumination of the light.   Naturally the engineer's observation could not extend as far along the track as it would if the track were straight, so that the light would shine down it in a straight line.   If it had been light and clear, the engineer says that he could have seen seven or eight car lengths; and that, if he could have seen the horses ten car lengths ahead, he could have slowed up sufficiently and have alarmed the horses, so as to avoid striking them.   Having but sixty feet of space, and running at thirty-five miles an hour, he could not stop, or whistle, or ring a bell; that is, he could not give his attention to stopping the train, and sounding alarms at once, in that distance, and at that rate.   His first attention was given to applying his air brakes.   The following is his language: "I did not blow the whistle for the reason

that I did not have time. I did not have time to ring the bell
either. In an emergency, the first thing we do is to apply the
air brakes. That is where our safety lies. I did not have time
to turn them. If I should have done anything, I should have
applied my brakes. I got hold of them. I had my air on them
just as I was going by, and I let it off when I saw that it was
all safe." So it is testified, and it is not questioned that the
engineer did his duty in getting to his brakes. Then he was
past the horses, the danger was over, the damage was done.
There was then no occasion for the bell or the whistle, and
before undertaking to use the brakes, there was no opportunity
to sound the whistle or bell. The fireman's testimony is cor-
roborative of that of the engineer. This is all the direct evi-
dence of facts at the time of the accident. If this evidence is
true, no reasonable being can read it and discover any negligence
in the conduct of defendant. And, moreover, respondent's counsel
does not undertake to claim that there is any evidence of negli-
gence if this testimony is true. He takes another position, viz.,
that the engineer and fireman did not tell the truth as to the
circumstances of the killing. He says that they were manu-
facturing a case. This is a grave charge. It can scarcely be
indulged as a presumption or assumption in regard to any
unimpeached witnesses. These witnesses are unimpeached by
any direct testimony. Respondent finds their impeachment in
circumstances, and holds that the jury were the judges of their
credibility, and that their conclusion is final.

Of course, circumstances may impeach a witness more con-
clusively than words. The circumstances which respondent
calls to his aid are in two classes. I will examine them : —

1. It was sought to impeach defendant's witnesses by evi-
dence that the weather, instead of being misty and foggy, as
the engineer and fireman testified, was clear. If this be true,
much of the foundation of the defense is demolished, and
defendant's main witnesses are impeached upon a very material
point, and the jury were justified in ignoring their testimony,
as they did. Let us see. Witness Ramsdell testifies that the
weather was bright and clear at 9 or 10 o'clock of the morning
of the 24th. Byron Wood says that the weather was smoky,
but the sun was shining so as to cast a shadow on the afternoon

of the 23d and the morning of the 24th. That in the morning there was no evidence of rain having falling in the night. He passed the night at Deer Lodge, four or five miles from Kohr's Siding. He would not pretend to say how the weather was at the place of the accident, as he was not there. He should think that daylight would show at 2 or 3 o'clock A. M. on September 24th. This was an impeaching witness. Possibly the value of his testimony may be to some extent guaged by his statement that daylight shows three or four hours before sunrise. J. H. Meyers came from Philipsburg, fifty miles from the place of the accident, on the morning of the 24th, passing Kohr's Siding at about 10 A. M. The weather was clear. Peter Patterson, a passenger on No. 5, left the train at Deer Lodge, about five miles before the train struck the horses. The weather was not stormy. He could not say that it was cloudy. Does not remember whether the stars were shining. There was no fog at Deer Lodge. He does not know how it was at Kohr's Siding, four or five miles away, and later than the time of his observation. Joseph Smith was at Kohr's Siding at 8 P. M. of the 23d and 7 A. M. of the 24th. The weather was good and no fog. Such is the evidence adduced to show that the defendant's witnesses falsified when they said that there was fog and mist at the place of the accident at 3:35 A. M. Not an impeaching witness testifies as to the weather at the time and place of the accident. They are as far away as fifty miles in distance and ten hours in time. The one who gets the nearest in time — probably within fifteen minutes — is four or five miles distant; and the witness nearest in place is several hours removed in time. The place of the accident was in the valley by the river. Is it not within the most ordinary knowledge that it could be perfectly true that mist and fog could hang over the railroad track, by the river, at such an hour as 3:35 A. M., and still, miles away, and hours later and earlier, the weather be clear? This is too plain to merit discussion or comment. There was not in this showing a *scintilla* of evidence tending to impeach the testimony of the engineer and fireman of train No. 5. There was no conflict of evidence as to the mist and fog at Kohr's Siding at 3:35 A. M., and for a considerable period each side of that

exact time.   The evidence was all one way, and was with the defendant.

But again, train No. 9 passed this point on the morning of the 24th, between 2 and 3 o'clock—about an hour before the accident.   The engineer and fireman of No. 9 testified on the trial that the weather was then foggy and misty.   To impeach this engineer of train No. 9, a report of his was introduced in evidence, in which he reports the weather at that time as clear. Grant that his report was true, and that his testimony on the trial was false, and that he was successfully impeached.   What did this amount to at most?   Simply that there was not fog or mist at the place of the accident an hour earlier in the night than the time of the accident.   Can this be held as evidence that the fog and mist did not come up during the hour, and be present when train 5 appeared upon the scene?   This would be indulging in meteorological presumptions unwarranted by any evidence in this case, or any experience of mankind. Again, granting that the engineer of No. 9 was impeached, does that impeach the engineer and fireman of No. 5?   If so, that would be reforming the old maxim, so that it could be said of a collection of witnesses on one side of the case *unus falsus, omnes falsi.*

Again, grant that there was no evidence of rain in the morning; that does not tend to show that fog and mist were not present in the night, and which fled before the sun.   The whole evidence seeking to contradict the alleged presence of fog and mist at the time and place of the accident has not the substantiality of a cobweb.   There was absolutely nothing in it upon which a jury could find an impeachment of the credibility of defendant's witnesses.

2.   As to the other circumstances of impeachment: Respondent argues that the places in which the horses were killed establish that the manner of their taking off was other than as detailed by the defendant's witnesses.   He says that first one was killed; the second was killed at a point five hundred and forty-three feet further on ; the next, one hundred and thirty-two feet beyond; and the last, one hundred and twenty-five feet further. That this fact shows that the engine chased the horses, taking them single-handed, picking them off one by one, as it was able

to reach and slaughter them, after the manner of the historical battle of the Horatii and the Curiatii. But what is the evidence that the horses were killed at these points? In the first place, not a witness testifies, nor a circumstance shows, that the horses were killed at these points by the train; and, in the second place, not one of the horses was killed by the train. At 9:30 A. M. of the 24th the section foreman found the horses, all crippled, in the ditch, and so badly hurt that they could not live, and he killed and buried them all. The measurements from which we take the above figures were made a week or ten days after the killing, and were to the places of their respective sepultures. It is not shown that they were buried where they were struck. It is not shown how far they were thrown by the terrific force that met them, nor how far they moved in their crippled condition between 3:35 and 9:30 A. M. They were all alive when the foreman found them. To hold that it appears that they were struck by the locomotive at the particular places where they were afterwards buried is, in the light of the facts, a pure assumption. So the whole fabric of impeachment dissolves. Defendant's witnesses are left uncontradicted, and their testimony shows that there was no negligence of defendant in this accident. It seems to be considered in the majority opinion that it may have been negligence to run the train on card time through a bank of fog; but I supposed that the theory of the affirmance of this case was that the fog did not exist. I am of opinion that the judgment should be reversed, and a new trial ordered.

My remarks, made to this point, were filed with the majority opinion on March 28, 1892. Since that day, the majority opinion has received additional matter, among it the criticism of my views which is now contained therein. I have now, at the June term, carefully examined that opinion. There is matter therein to which, as it occurs to me, some pertinent suggestions might be made; but a further review on my part at this time would seem to me more in the nature of a debate than a judicial consideration, and neither useful nor profitable.